# Supreme Court of Texas

No. 21-0998

In the Interest of A.A., G.A., and K.A., Children

On Petition for Review from the
Court of Appeals for the Seventh District of Texas

**Argued October 4, 2022**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which Justice Lehrmann, Justice Boyd, Justice Devine, Justice Bland, and Justice Huddle joined.

JUSTICE YOUNG filed a dissenting opinion, in which Justice Blacklock and Justice Busby joined.

By statute, a Texas court "may order termination of the parent-child relationship if . . . the parent has . . . failed to comply with" a service plan ordered by the court "as a result of the child's removal from the parent . . . for the abuse or neglect of the child".[1] Here, Mother challenges termination of her parental rights under this provision, asserting that her children were ordered removed to the Department of Family and Protective Services from Father's home and for his

---

[1] TEX. FAM. CODE § 161.001(b)(1)(O).

wrongdoing, not hers. But removal is not merely relocation. The court's order ended both parents' legal custody of the children and transferred them to the Department's statutory conservatorship based on evidence of misconduct by both parents that amounted to abuse and neglect.

In *In re E.C.R.*, we held that a mother's rights to one child could be terminated due to her abuse and neglect of another child because her conduct toward the one placed the other's health and safety at risk.[2] By a similar analysis, here we hold that sufficient evidence exists that Mother's misconduct in exposing her children to Father's abuse and neglect was itself abuse and neglect on her part. The evidence before the court when it signed the order of removal and the testimony subsequently presented at trial are sufficient to support the trial court's finding that Mother's acts and omissions, which render her an unfit parent, were easily within the broad statutory definition of "abuse or neglect".

We hold that the trial court's findings that Mother failed to comply with her service plan and that termination of her rights is in her children's best interest are supported by legally sufficient evidence. And we reject Mother's challenges to the trial court's jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act.[3]

We affirm the judgment of the court of appeals.[4]

**I**

Mother, age 34 at the final termination hearing, first

---

[2] 402 S.W.3d 239, 240 (Tex. 2013).

[3] TEX. FAM. CODE §§ 152.101-152.112.

[4] 635 S.W.3d 430 (Tex. App.—Amarillo 2021).

2

experimented with methamphetamine in high school and became addicted around the age of 20. In her 20s and early 30s, Mother cycled through several periods of sobriety and relapse. During that time, she married Father, and their three girls, A, G, and K, were born. Father also used drugs, and the marital relationship was marked by domestic violence. When K was still an infant, all three girls went to live with their maternal grandmother, Marilyn, and they remained in her care for some seven years. Mother, Father, Marilyn, and the girls all lived in Texico, New Mexico, on the Texas–New Mexico border.

In 2017, Mother and Father were divorced in New Mexico. The stipulated divorce decree gave Father "the sole legal care and physical custody" of the children with Mother's visitation to be as "agreed upon by the parties." Mother testified at trial in this case that she agreed to give custody of the three girls to Father—knowing that he, too, used drugs and could be physically violent—because another child of hers had recently died and she "was trying to cope with that". She "figured [Father] was doing better than [she] was at the time" and so the children "would be better with him".[5] When pressed about the impact of Father's domestic violence on her decision to give him custody, Mother reasoned:

> Well, he had taken anger management classes and he had been in a -- what is it, halfway house kind of -- after he got out of prison and I -- I had seen a noticeable change in his anger so I thought they would be okay. Plus his mother was with him also to help. So . . . I figured they would be okay.

After the divorce, Father and the children moved across the border to Amarillo, Texas. The next year, Mother had another child in

---

[5] The record does not reflect the circumstances of the child's death.

New Mexico. That child lives with her father. Mother's testimony indicates that because of an open CPS investigation in New Mexico, she is permitted only supervised visits with that child.

The record does not show how much contact Mother had with A, G, and K after they moved to Texas with Father. Mother testified, however, that one September,[6] G told her that Father had "lost his temper and held her down on the bed and hit her [on] her side." Mother testified that she reported the incident to the police. The incident led to Father's indictment in 2021 for causing intentional bodily injury to a child. The indictment states that the incident occurred on September 21, 2019, shortly before the Department became involved with the family.

Investigator Ashley Francis testified that in October 2019, DFPS received a tip that A, G, and K—then 10, 9, and 7, respectively—were being left alone, unsupervised. When Francis met with Father, he admitted that he had used methamphetamine and marijuana a few days before. DFPS formed a safety plan that required Father's mother, Lanetta, to either keep the girls herself or move into Father's home and supervise all interactions between Father and the girls. The plan lasted only about five months. In early April 2020, Francis stopped by Father's home and found him home with the children, unsupervised. The trial court granted the Department's petition for removal of the children from both parents, and they were immediately moved into a foster home.

In the affidavit supporting removal, Francis alleges that when

---

[6] Mother testified that she thought the incident occurred in September 2018. But as explained above, the record reflects that the incident occurred in September 2019.

she contacted Father in October 2019, he did not have contact information for Mother and said that he believed her to be incarcerated. The Department was unable to locate her on its own. In early 2020, Father reported that Mother was in a rehabilitation facility in New Mexico but could not provide any information about it. A few weeks later, he said that Mother was no longer there. Father still could not provide a phone number for Mother but offered to contact her through social media to give her Francis' contact information.

Francis finally made contact with Mother in February 2020—four months after the Department initiated its investigation. In that phone call, Mother told Francis that she and Father "cannot get along, that there had been domestic violence in their relationship, and that she had concerns regarding his drug use." Francis spoke to Mother again in April after the children were moved into foster care. Francis asked Mother to take a drug test, which was positive for methamphetamine.

Termination proceedings ensued, which we detail below. The trial court ultimately terminated Mother's rights under Section 161.001(b)(1)(O) for failure to comply with her service plan. The court terminated Father's rights too, but he did not appeal.

## II

Before turning to the main issue, we address Mother's argument that the trial court lacked jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act to terminate her parental rights. Texas and New Mexico have both adopted the UCCJEA. In Texas, the

5

Act is codified in Chapter 152 of the Family Code.[7]

Under Section 202 of the Act, the court that has made an initial child-custody determination "has exclusive[,] continuing jurisdiction over the determination until" that court declines or loses jurisdiction in accordance with the Act.[8] Under Section 203, a second court "may not modify a child custody determination made by a court of another state unless" the second court would have original jurisdiction under the Act and:

(1) the initial court determines it no longer has exclusive, continuing jurisdiction under Section 202 or that the state of the second court would be a more convenient forum under Section 207; or

(2) the initial court or the second court determines that the child and the child's parents no longer reside in the state of the initial court.[9]

Both sections authorize a court to exercise emergency temporary jurisdiction over a child within its borders when it is necessary to protect the child. Once a court has done so, that court assumes a duty to communicate with any court that made an initial custody determination involving the child to determine whether the initial court will retain or relinquish jurisdiction.[10] A record must be made of the communication, and the parties must be notified and given access to it.[11]

---

[7] TEX. FAM. CODE §§ 152.001-152.317; *cf.* N.M. STAT. ANN. §§ 40-10A-101 to 40-10A-403.

[8] TEX. FAM. CODE § 152.202(a); *see* N.M. STAT. ANN. § 40-10A-202(a).

[9] TEX. FAM. CODE § 152.203; *see* N.M. STAT. ANN. § 40-10A-203.

[10] TEX. FAM. CODE §§ 152.110(b), 152.204(d); *see* N.M. STAT. ANN. §§ 40-10A-110(a), 40-10A-204(d).

[11] TEX. FAM. CODE § 152.110(f); *see* N.M. STAT. ANN. § 40-10A-110(d).

In 2017, the Ninth Judicial District Court of Curry County, New Mexico, made an initial child-custody determination under the UCCJEA with respect to A, G, and K when it gave Father sole legal care of the girls in the divorce decree. Prior to the termination trial, the Department filed a motion asking the trial court to confer with the New Mexico district court about jurisdiction. At the April 5, 2021 trial, before testimony commenced, counsel for the Department raised its request to confer orally, and the court responded that it would do so after taking testimony.

The record contains this April 27, 2021 email from the New Mexico court declining jurisdiction:

> Judge Graham,
>
> As per our conversation, New Mexico will decline to exercise jurisdiction over this case since the children have resided in Texas for more than the last 6 months, and Texas is a more convenient forum.
>
> Regards,
> Dave Reeb

The trial court's termination order was signed a week later. It recites findings that the New Mexico court declined to exercise continuing jurisdiction under the UCCJEA and that the courts of Texas have jurisdiction under the Act to modify the child-custody determination with respect to A, G, and K.

Mother acknowledges that the statutory criteria in Section 203 for modifying a child-custody determination made in another state were satisfied before the trial court signed the termination order. But she argues that the order is void because the entire trial was held before the court received notice that the New Mexico court would decline

7

jurisdiction. She points us to no section of the UCCJEA, nor any caselaw, prohibiting the commencement of trial before the interstate conference occurs or the initial court's declination of jurisdiction is made part of the record.

In fact, the text of Section 203 cuts against Mother's argument. It says that "a court of this state *may not modify a child custody determination* made by a court of another state unless" the statutory criteria are met.[12] The modification occurs in the order, not in the taking of testimony. We reject Mother's challenge to the trial court's jurisdiction.[13]

## III

Mother's primary argument is that her rights cannot be terminated under Section 161.001(b)(1)(O) for failure to comply with her service plan because she "was the non-offending parent". In Mother's view, the children were not removed from *her* care or due to *her* abuse or neglect, but from *Father's* care due to *his* abuse. The statute provides:

> (b) The court may order termination of the parent-child relationship if the court finds by clear and convincing

---

[12] TEX. FAM. CODE § 152.203 (emphasis added).

[13] DFPS characterizes Mother's complaint as *procedural*, rather than jurisdictional, and argues that Mother waived it by failing to object at trial. The Department points to caselaw holding that provisions in the UCCJEA relating to communications between the initial court and the modifying court are procedural and need only be substantially complied with. *See In re J.P.*, 598 S.W.3d 789, 799 (Tex. App.—Fort Worth 2020, pet. denied) ("Section 152.110 is a procedural rather than a jurisdictional statute." (citing Texas and California cases)); *id.* at 800-801 ("[A]lthough we reiterate that it is not jurisdictional, we conclude that the trial court substantially complied with Section 152.110."). Because we reject Mother's complaint on its merits, we need not decide if it is really a procedural one that she was required to preserve.

evidence:

(1) that the parent has:

. . . .

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months *as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child*[.][14]

## A

Mother relies on the statute's reference to "the child's removal from *the parent* . . . for . . . abuse or neglect", which she reads as limiting (O)'s reach to a parent whose wrongdoing caused a child to be physically taken from that parent. We disagree. Mother's argument turns on the meaning of two terms in (O): *removal* and *abuse or neglect*. When these terms are viewed in the context of the statute as a whole[15] and against the backdrop of our analysis in *In re E.C.R.*, the record contains sufficient evidence that A, G, and K were indeed "remov[ed] from [Mother] under Chapter 262 for . . . abuse or neglect".

---

[14] TEX. FAM. CODE § 161.001(b)(1)(O) (emphasis added).

[15] *See, e.g.*, *Miles v. Tex. Cent. R.R. & Infrastructure, Inc.*, 647 S.W.3d 613, 619 (Tex. 2022) ("In interpreting statutes, we must look to the plain language, construing the text in light of the statute as a whole. . . . The statutory words must be determined considering the context in which they are used, not in isolation." (quoting *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019))).

**1**

Neither party points to a definition of *removal* in the Family Code, but Mother assumes that the term is limited to the Department's taking physical possession of a child from a specific person or place. But Paragraph (O) tells us that removal happens "under Chapter 262", and in Chapter 262, the concept of removal is far broader. Removal is effectuated by a temporary court order that transfers not just the right to physical possession from a parent to DFPS but an entire bundle of conservatorship rights from one or both parents to DFPS.

Subchapter B of Chapter 262 is titled "Taking Possession of Child".[16] As a general rule, before DFPS can "take possession of a child", the Department must do two things: (1) file a suit affecting the parent–child relationship that is supported by an affidavit;[17] and (2) obtain an emergency order.[18] Ordinarily, the order is signed without a hearing, based on the allegations in DFPS' petition and affidavit.[19] But the order is only temporary, expiring 14 days after its signing.[20] Then a full adversary hearing is held.[21]

---

[16] TEX. FAM. CODE §§ 262.101-262.116.

[17] *Id.* § 262.101. In emergency circumstances, DFPS can take possession of the child before obtaining the court order, *id.* § 262.104, but the Department must then file its conservatorship petition "without unnecessary delay," *id.* § 262.105(a), and the court must hold a hearing "on or before the first business day after the date the child is taken into possession." *Id.* § 262.106(a).

[18] *Id.* § 262.102.

[19] *See id.* § 262.102(a). *But see id.* § 262.106 (requiring a hearing after a child is taken into possession without a court order under Section 262.104).

[20] *Id.* § 262.103.

[21] *Id.* § 262.201(a).

The emergency order does not just address physical possession. Chapter 262 equates it to "a temporary order for the conservatorship of a child under Section 105.001(a)(1)",[22] which is the provision authorizing temporary conservatorship orders in other settings, such as divorce. Section 151.001 of the Family Code lists legal rights and duties that a parent has by default:

(1)    the right to have physical possession, to direct the moral and religious training, and to designate the residence of the child;

(2)    the duty of care, control, protection, and reasonable discipline of the child;

(3)    the duty to support the child, including providing the child with clothing, food, shelter, medical and dental care, and education;

(4)    the duty . . . to manage the estate of the child . . . ;

(5)    [with exceptions], the right to the services and earnings of the child;

(6)    the right to consent to the child's marriage, enlistment in the armed forces of the United States, medical and dental care, and psychiatric, psychological, and surgical treatment;

(7)    the right to represent the child in legal action and to make other decisions of substantial legal significance concerning the child;

(8)    the right to receive and give receipt for payments for the support of the child and to hold or disburse funds for the benefit of the child;

(9)    the right to inherit from and through the child;

(10)   the right to make decisions concerning the child's education; and

---

[22] *Id.* § 262.102(a).

11

(11)    any other right or duty existing between a parent and child by virtue of law.[23]

Section 153.371 lists rights and duties that, "[u]nless limited by court order", attach to DFPS when it is appointed as the managing conservator of a child.[24] The list in Section 153.371 is almost verbatim of that in Section 151.001.[25] In an emergency order issued under Chapter 262, the court appoints DFPS as the temporary sole managing conservator of the child at issue and addresses what rights of conservatorship are transferred from the parent to DFPS as a result of that appointment. Therefore, the removal of a child under Chapter 262 is not just a physical act. It also includes the transfer by court order of the bundle of rights that the law gives a parent by default from the parent to DFPS.

**2**

Our decision in *In re E.C.R.* adds to our analysis. In that case, mother's rights to infant ECR were terminated after she abused an older child. The question before us was whether the reference to "abuse or neglect" in (O) requires a showing of actual, past-tense abuse or neglect or whether the reference can encompass circumstances that would "plac[e] the child's physical health or safety at substantial risk".[26] We held that *abuse or neglect* is "used broadly" in (O) and "necessarily

---

[23] *Id.* § 151.001(a).

[24] *Id.* § 153.371(1)-(12).

[25] A parent does not lose "the right to inherit from and through the child" when DFPS is appointed as the child's managing conservator. *Compare id.* § 151.001(a)(9), *with id.* § 153.371. There may be other minor differences.

[26] *E.C.R.*, 402 S.W.3d at 240.

12

includes the risks or threats of the environment in which the child is placed."[27] Two parts of our analysis are important to this case.

The first is that we linked the phrase *abuse or neglect* in (O) with "[t]he standard used repeatedly throughout chapter 262", which is "danger to the physical health or safety of the child."[28] The petition and affidavit that DFPS file before removal must "stat[e] facts sufficient to satisfy a person of ordinary prudence and caution that[] . . . there is an immediate danger to the physical health or safety of the child".[29] The trial court must make the same finding in an emergency order authorizing removal.[30] After the full adversary hearing held a few weeks later, "the court shall order the return of the child to the parent . . . unless the court finds . . . [that] there was a danger to the physical health or safety of the child, . . . which was caused by an act or failure to act of the person entitled to possession"[31] and that the danger continues.[32] In *E.C.R.*, we explained that the "danger" standard in Chapter 262 is "centered on risk, rather than just a history of actual abuse or neglect".[33]

The second salient point from *E.C.R.* is *how* we determined that the predicate to (O)'s application had been met in that case: We looked

---

[27] *Id.* at 248.

[28] *Id.* at 247.

[29] TEX. FAM. CODE § 262.101(1).

[30] *Id.* § 262.102(a)(1).

[31] *Id.* § 262.201(g)(1).

[32] *Id.* § 262.201(g)(3).

[33] *E.C.R.*, 402 S.W.3d at 247.

to the record. We noted that the Department had followed the procedures in Chapter 262 by filing a conservatorship petition and removal affidavit that recounted mother's physical abuse of ECR's sister, for which she was arrested and charged; mother's prior involvement with authorities for abusing an older son; mother's history of leaving ECR with her boyfriend, a known criminal who is not ECR's father; and mother's incarceration.[34] Though we acknowledged that the affidavit was "not evidence for all purposes", we said that it "show[ed] what the trial court relied on in determining whether removal was justified."[35]

After the petition and affidavit were filed, the court issued an emergency temporary order that "found sufficient evidence . . . that E.C.R. faced an immediate danger to his physical health or safety, that the urgent need to protect him required his immediate removal, and that he faced a substantial risk of a continuing danger if he were returned home".[36] Finally, we pointed out that mother had not challenged those findings, and we cited authority that temporary orders in suits affecting the parent–child relationship are reviewable by mandamus.[37] We held that this record "conclusively establishe[d] that E.C.R. was removed from [mother] under Chapter 262 of the Family Code for abuse or neglect".[38]

---

[34] *Id.* at 248.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 248 & n.8.

[38] *Id.* at 249.

14

**3**

Here, too, the record contains sufficient evidence that the factual predicate to the application of (O) has been met. After DFPS filed its conservatorship petition and affidavit, the trial court signed a temporary emergency order under Chapter 262. This removal order expressly affects Mother's rights. It identifies her by name as a "parent" and a "Respondent". It orders her to take certain actions and notifies her of certain actions the court may take against her at the adversary hearing, including requiring her to comply with the Department's service plan. It specifically grants the Department "the right of physical possession" based on express findings that the Department made reasonable efforts to avoid "removal of the children . . . from the home" and to make it possible for the children "to return home", but that "continuation in the home of [Mother] *or* [Father] would be contrary to the children's welfare".

Consistent with the removal order, the temporary order following the adversary hearing also identified Mother by name and found sufficient evidence that it was contrary to the welfare of the children to remain in the home of either Mother or Father; that reasonable efforts were made to prevent the children's removal and to enable them to return to the home of Mother or Father; and that a substantial risk of continuing danger existed if the children were returned to the home of Mother or Father. The order also directed Mother to comply with the Department's service plan.

By their clear language, these orders confirm that the removal order legally removed the children from both Mother and Father,

regardless of who had legal or physical possession of the children at the time.

The Department's affidavit shows what the trial court relied on to find that continuation in the home of Mother would be contrary to the children's welfare. The affidavit recounts investigator Francis' efforts in October 2019 to find Mother through "an [A]ccurint search"[39] and Father's statement to Francis around the same time that he believed Mother to be incarcerated. Later, it contains this paragraph about Francis' communications with Mother in February 2020:

> On February 18, 2020 I was able to make contact with [Mother]. The girls were in her custody and care for a long time. She had a daughter pass away, and she lost her mind about it. She signed the girls over to him during the divorce due to her issues after her daughter passed away. She moved here 5 to 6 months ago to be near the girls. She and [Father] cannot get along, they had a rough marriage with domestic violence involved. She has in the past had concerns regarding his aggression. She does have concerns with [Father] regarding drug and alcohol use. His anger is a lot worse when he is using. She has been there in Clovis, going through a divorce with her now ex. She went to [Messila Valley] for a bit, to get her mind right and back on her meds. She has a job interview on the 20th. She is staying at the Hartley house, which is a domestic violence shelter there. She does intend to go back to court and fight for custody for the girls. . . .

Though not a model of clarity or thoroughness, the affidavit reflects that Mother voluntarily relinquished custody of the children to Father despite a history of domestic violence and concerns over his

---

[39] LexisNexis Accurint "is a direct connection to public records to help verify identities, conduct investigations and detect fraud." ACCURINT, https://www.accurint.com (last visited May 25, 2023).

aggression and substance abuse and that she lacked stable housing or employment. The trial court could have believed that the affidavit demonstrated "an immediate danger" to the children if they were placed in Mother's care.

Mother was represented by counsel at the full adversary hearing, held a few weeks after the temporary emergency order was signed. The transcript of that hearing is not in the record, but the hearing resulted in the trial court's signing another temporary order that makes the required "danger" finding and directs that A, G, and K remain in the temporary managing conservatorship of the Department. As in *E.C.R.*, there is no indication in the record of this case that Mother's counsel challenged the order by mandamus.[40] In fact, there is no indication that Mother argued at any stage of the trial court proceedings that the factual predicate to (O) had not been met.

Perhaps that is because of the uncontroverted trial testimony that DFPS refused to give the children to Mother because she tested positive for methamphetamine at the outset of the case. Here is the exchange between DFPS and Investigator Francis:

> Q. Okay. After removal of the children, did you make contact again with [Mother]?
>
> A. Yes, I did.
>
> Q. Okay. And what did you and [Mother] discuss?
>
> A. I explained to her that we had removed the children and why.
>
> Q. Okay. Did you also ask her to drug screen?

---

[40] *See E.C.R.*, 402 S.W.3d at 248 & n.8.

A. Yes, ma'am, I did.

Q. Okay. And did that drug screen come out positive?

A. Yes, ma'am.

Q. Okay. And was that for methamphetamine?

A. Yes, ma'am.

Q. Okay. So at that point [Mother] was not appropriate for the children to reside with. Correct?

A. Correct.

Drug use is included in the list of behaviors constituting abuse under Chapter 261.[41] And though Mother's positive test was not mentioned in the Department's removal affidavit, a parent's methamphetamine use surely poses "an immediate danger to the physical health or safety of [a] child" within the meaning of Chapter 262. Indeed, Mother's appellate counsel conceded as much at oral argument when he said: "But you know, she's using drugs. She can't keep a job. She don't have a home. She hasn't done anything to harm these kids yet, but in all likelihood, if we put those children back with her, something bad is going to happen".

**4**

Most, if not all, of the intermediate courts of appeals have rejected the argument that Mother makes here.[42] Mother cites only a single case,

---

[41] Tex. Fam. Code § 261.001(1)(I).

[42] *See In re S.N.*, 287 S.W.3d 183, 188 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("[W]e conclude that subsection (O) does not require that the parent who failed to comply with a court order be the same parent whose abuse or neglect of the child warranted the child's removal. Had the legislature intended such a requirement, it could have easily provided that conservatorship be 'as a result of the child's removal from the parent under

*In re J.E.H.*,[43] but it is inapposite. The child there was removed from father's care after the Department received a tip that father was driving while under the influence of marijuana with the child in the car. DFPS called father to testify on the opening day of trial, but then the court called a recess, and the trial did not resume until two months later. When it did, the Department rested without calling the caseworker to testify. The only testimony presented at trial was that of father and his sister. Not surprisingly, the court of appeals held that the Department had failed to carry its burden of proof on (O).[44]

## B

Concerns were raised at oral argument that DFPS may pursue termination under (O) rather than the endangerment grounds in (D)[45] and (E)[46] where (O) is easier to prove. Court-ordered service plans can be long and detailed. Some of the requirements are very specific, such

---

Chapter 262 for the abuse or neglect of the child *by the parent*.'"); *see also* 635 S.W.3d at 440 ("[T]he Department is not required to show that the parent who failed to comply with a court order is the same parent whose abuse or neglect of the children warranted the children's removal."); *In re J.R.H.*, No. 06-18-00052-CV, 2018 WL 6625886, at *4 (Tex. App.—Texarkana Dec. 19, 2018, pet. denied) (same); *In re D.R.J.*, 395 S.W.3d 316, 320 (Tex. App.—Fort Worth 2013, no pet.) (same); *In re M.D.*, No. 10-13-00005-CV, 2013 WL 1558012, at *2 (Tex. App.—Waco Apr. 11, 2013, pet. denied) (same); *In re M.N.*, No. 11-10-00129-CV, 2011 WL 917837, at *3 (Tex. App.—Eastland Mar. 17, 2011, no pet.) (same).

[43] 384 S.W.3d 864 (Tex. App.—San Antonio 2012, no pet.).

[44] *See id.* at 870-871.

[45] TEX. FAM. CODE § 161.001(b)(1)(D) (placing the child in endangering conditions).

[46] *Id.* § 161.001(b)(1)(E) (engaging in endangering conduct).

as a counseling course with a specific counselor that must be completed by a specific date. Some of the requirements are vague and subjective, such as maintaining "regular contact" with the caseworker. These plans can be difficult—perhaps impossible—to comply with fully, especially if the parent has limited English proficiency or lacks reliable transportation, reliable internet access, or the ability to take time off work. At trial, DFPS typically demonstrates a parent's failure to comply with the service plan through the testimony of the parent's caseworker. In some cases, that could be a more straightforward path to a termination judgment for DFPS than putting on witnesses to make a case of endangerment would be. The more straightforward path is not always the right one, and our judicial antennae are raised and attuned to potential misuses of (O).

But we are satisfied that is not what happened here.[47] To the contrary, this is exactly the kind of case that (O) is for. DFPS cannot leave a child with a parent whose conduct or home environment would endanger the child; several policy statements in the Family Code make that clear.[48] DFPS had to pursue removal of A, G, and K from Mother

---

[47] The dissent proposes the hypothetical possibility of DFPS initiating termination proceedings against a mother who returns home from deployment to discover abuse of the children by the father. *See post* at 17-18 (Young, J., dissenting). Notably, the mother in the hypothetical does not have a long history of methamphetamine use and instability, and she did not test positive for methamphetamine at the outset of proceedings.

[48] *See* TEX. FAM. CODE § 262.001(b) ("In determining the reasonable efforts that are required to be made with respect to preventing or eliminating the need to remove a child from the child's home or to make it possible to return a child to the child's home, the child's health and safety is the paramount concern."); *see also id.* § 153.001(a) ("The public policy of this state is to:

once it determined that Mother could not provide a stable home environment for them. In a case like this one where the other parent's conduct directly caused DFPS' involvement, none of the other Section 161.001(b)(1) grounds may provide a pathway to either reunification or termination. That is the work that (O) does. It gives a parent like Mother an opportunity to have the child returned to her by demonstrating her parenting ability through compliance with the service plan. But at the same time, if the parent in Mother's position cannot demonstrate her ability to provide a stable home for the child, then her rights to the child can be terminated, thereby clearing the path for the child's adoption.[49]

## C

The dissent seems to agree that removal of a child from a parent under Chapter 262 is a legal change and not merely a physical one, though it repeats that DFPS took possession of the children at Father's home, suggesting that the relocation was more important than it is. But the dissent asks: "[W]hat right was removed *from Mother* and transferred to the State?"[50] As shown by the trial court's orders set out above, the children were transferred to DFPS as their conservator,

---

(1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child; [and] (2) provide a safe, stable, and nonviolent environment for the child . . . .").

[49] *See id.* § 153.371(11) (providing that DFPS can consent to the adoption of a child for whom it has been appointed managing conservator "if the parent-child relationship has been terminated with respect to the parents").

[50] *Post* at 10 (Young, J., dissenting).

temporarily ending both Mother's and Father's exercise of control of them without DFPS approval. The dissent seems to believe that the New Mexico divorce decree terminated all Mother's legal rights in her children, when it did not and could not do so. Mother's parental rights to her children were not at issue in her divorce as they are here. The divorce decree, based solely on Father's and Mother's stipulation, made Father the children's custodian, but it left Mother with the right to visitation as agreed by Father. The dissent argues that it was the extent of the divorce decree that left Mother with nothing for DFPS to remove. "[T]hings *might* be different", the dissent argues, if Mother had retained more custodial rights under the divorce decree than she did.[51] So if Mother had been left with visitation one day a quarter, or a month, or maybe a week, instead of with Father's agreement, then the orders the court issued under Chapter 262 would actually have accomplished DFPS' removal of the children from her. Surely such a rule would be unworkable. More importantly, there is no legal basis for it.

Paradoxically, the dissent argues that if the termination of Mother's rights were reversed, DFPS could immediately refile removal proceedings to protect the children and, with no change in the situation other than the termination of Father's rights, could proceed exactly as before to terminate Mother's rights properly. In other words, if Father has parental rights, Mother has no rights to remove, but if Father's rights are terminated, the children can be removed from Mother, though possession and the right to custody have not changed. The dissent's

---

[51] *Id.* at 6 (emphasis added).

position is illogical, but again, more importantly, the dissent provides no legal basis for it.

The dissent acknowledges that Mother's drug use renders her unfit. Mother acknowledges that herself. With this case having been in litigation for three years, the dissent would put both DFPS and Mother through another round to obtain what the dissent hopes, barring Mother's redemption, will be the exact same result. All this is necessary, the dissent warns, so that a mother returning from military deployment—only to find that in her absence, and without her knowledge, father has abused and neglected the children by relapsing into drugs—will not become "embroiled in a controversy with the State."[52] In such a situation, DFPS would gladly have the children put with their mother, and if it did not take that action immediately, the military-veteran mother would easily complete any service plan that might be proposed. The dissent's trepidation over abuse of innocent parents in a case in which both parents are indisputably and by their own admission unfit is difficult to understand.

## IV

Finally, we address Mother's challenges to the legal sufficiency of the evidence to support the trial court's findings that Mother failed to comply with her service plan[53] and that termination is in the best interest of A, G, and K.[54] We take them in turn.

At oral argument, Mother's counsel acknowledged that "there's no

---

[52] *Id.* at 18.

[53] TEX. FAM. CODE § 161.001(b)(1)(O).

[54] *Id.* § 161.001(b)(2).

question that she did fail to work the services. She did fail to remain drug free." Indeed, Mother's caseworker, ShaiAnne McAdoo, testified at trial that Mother:

- "hadn't been compliant with updating the Department on her changes of residence";

- was not able to maintain stable housing;

- "tested positive [for drugs] on her screenings" and did not get screened on some occasions, as requested;

- did not initiate individual counseling as required;

- did not complete a psychological evaluation;

- did not complete rational behavior therapy;

- did not complete parenting classes; and

- missed or failed to fully complete several drug screens.

With respect to a missed screening in December 2020, Mother admitted at trial that she was using methamphetamine at that time. When asked why by the Department's counsel, Mother responded, "[b]ecause it was the holidays and I wasn't around my girls." Mother also admitted to using methamphetamine in June and July of 2020, after the court ordered the service plan. When asked whether she "believe[s] it's necessary to be completely sober to be a good parent", Mother responded: "[N]o, I don't think that's a true statement."

In her brief, Mother relies on Section 161.001(d), which provides that a court may not order termination under (O) if the parent proves by a preponderance of the evidence that:

    (1)    the parent was unable to comply with specific provisions of the court order; and

    (2)    the parent made a good faith effort to comply with the order and the failure to comply with the order is

24

not attributable to any fault of the parent.[55]

Mother points to snippets of her testimony in which she characterized her compliance with various parts of the service plan differently than the caseworker did. She then asserts that "a combination of poverty, lack of transportation, and miscommunication all combined to result in [her] failure to comply fully with her service plan."

After summarizing the evidence, the court of appeals concluded that "the trial court could have, under the requisite standard, found the evidence sufficient to support termination of [Mother's] parental rights under section 161.001(b)(1)(O)."[56] We agree with the court of appeals.

Mother also challenges the legal sufficiency of the evidence to support the trial court's best-interest finding. Rather than marshal the evidence to the *Holley* factors,[57] Mother reurges her arguments that she "was the non-offending parent" and made a good-faith effort to comply with her service plan. She also argues that the children could be placed with her stepmother, Marilyn, with whom A, G, and K lived for seven years before going to live with Father. Marilyn testified at trial that she

---

[55] *Id.* § 161.001(d).

[56] 635 S.W.3d at 442.

[57] In *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), we gave a nonexhaustive list of factors that should be considered when determining the best interest of a child. The factors we listed are: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) their plans for the child; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* at 372.

is willing to be a long-term placement for the children if need be.

The court of appeals acknowledged that Marilyn's testimony provides "some evidence in support of preserving [Mother's] parental rights to her children",[58] but it concluded that the ample evidence of Mother's drug use throughout the children's lives, her continued drug use during the case, and her history of instability provided sufficient evidence to support the trial court's best-interest finding.[59] Again, we agree with the court of appeals.

*     *     *     *     *

We hold that (1) the trial court did not lack jurisdiction over this case under the UCCJEA; (2) the record contains sufficient evidence that the children were "remov[ed] from [Mother] under Chapter 262 for abuse or neglect"; (3) there is legally sufficient evidence to support the trial court's finding that Mother failed to comply with her service plan; and (4) there is legally sufficient evidence to support the trial court's finding that termination is in the best interest of the children. We affirm the judgment of the court of appeals.

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** June 9, 2023

---

[58] 635 S.W.3d at 443.

[59] *See id.* at 443-444.

26